UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY S. BARBER, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 4:19 CV 2701 ACL |
| ANDREW M. SAUL, Commissioner of Social Security Administration, | ) ) ) ) ) |
| Defendant. | ) ) |

**<u>MEMORANDUM</u>**

Plaintiff Kimberly S. Barber brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's decision, following continuing disability review ("CDR"), finding that she was no longer entitled to previously-granted disability benefits under Titles II and XVI of the Social Security Act.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be reversed and remanded.

**I. Procedural History**

Barber initially filed for disability benefits on December 6, 2006. (Tr. 187-96) On December 5, 2008, Barber was found disabled beginning November 27, 2007, due to her mood and somatoform disorders. *Id.*

On October 31, 2014, the SSA concluded that Barber was no longer disabled as of October 15, 2014, due to medical improvement.  (Tr. 224-27.)  Barber appealed the termination of benefits, and the termination was affirmed upon reconsideration.  (Tr. 229-69.)  On May 6, 2016, following a hearing, an ALJ found Barber not disabled as of October 15, 2014.  (Tr. 204-18.)

On March 29, 2017, the Appeals Council granted Barber's request for review of the ALJ's May 6, 2016 decision and remanded the case back to the ALJ for further proceedings.  (Tr. 221-22.)  Specifically, the Appeals Council directed the ALJ to consider whether Barber was disabled during the entire period at issue—that is, from the date her disability ended in October 2014, through the date of the ALJ's decision in May 2016.  *Id.*

On March 28, 2019, following additional hearings, the ALJ issued an unfavorable decision finding that medical improvement related to the ability to work occurred as of October 15, 2014, and that Barber did not become disabled again at any time through the ALJ's decision.  (Tr. 10-19.)  On August 5, 2019, the Appeals Council denied Barber's request for review of the ALJ's decision.  (Tr. 1-6.)  Thus, the March 28, 2019 decision of the ALJ stands as the final decision of the Commissioner.

In the instant action, Barber argues that the ALJ "failed to properly evaluate severe medically determinable impairments pursuant to 20 C.F.R. § 404.1520."  (Doc. 18 at p. 3.)

## II.  The ALJ's Determination

The ALJ first found that Barber has not engaged in substantial gainful activity "in the post-December 14, 2014 period."  (Tr. 12.)  The ALJ next found that Barber had the following medically determinable impairments in the post-October 14, 2014 period:   an affective disorder

(variously diagnosed as a mood, major depressive or bipolar disorder), Wolff-Parkinson-White syndrome, degenerative disc disease, degenerative knee joint disease, fibromyalgia, bilateral tinea pedis, and bilateral lattice degermation and ocular melanocytosis.  *Id.*  She found that Barber's condition has not met or medically equaled the severity of one of the listed impairments in the post-October 14, 2014 period.  (Tr. 13.)  The ALJ concluded that Barber's condition had medically improved as of October 15, 2014, and that the improvement was related to her ability to work.  *Id.*  The ALJ next found that Barber's degenerative knee joint disease has been severe in the post-October 14, 2014 period.  *Id.*

>As to Barber's RFC, the ALJ stated:

>>Since October 15, 2014, the beneficiary has been able to work at all exertional levels.  She has also been able to occasionally kneel and crawl, occasionally climb ladders, ropes, scaffolds, ramps and stairs, and frequently stoop and crouch.

(Tr. 16.)

>The ALJ did not make a finding regarding Barber's past relevant work.  (Tr. 17.)  The ALJ found that a significant number of jobs have existed for Barber in the national economy since October 15, 2014.  (Tr. 18.)  The ALJ concluded that Barber's disability ceased on October 15, 2014, and that she has not become disabled again since then and through the date of the decision.  *Id.*

>The ALJ's final decision reads as follows:

>>The beneficiary's disability under sections 216(i), 223(f) and 1614(a)(3)(A) of the Social Security Act ceased on October 15, 2014, and she has not become disabled again since then and through the date of this decision.

(Tr. 19.)

### III. Statutory Framework and Standard of Review

Once an individual becomes entitled to disability and SSI benefits, her continued entitlement to benefits must be reviewed periodically. 42 U.S.C. § 423(f)(1); 20 C.F.R. § 404.1594(f), 416.949(a). If there has been medical improvement related to the claimant's ability to work, and the claimant is able to engage in substantial gainful activity, then a finding of not disabled will be appropriate. *Id.; Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991). The "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. *Delph v. Astrue*, 538 F.3d 940, 945-46 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 1999 (2009)).

The Eighth Circuit has articulated the burden in this type of case as follows:

> The claimant in a disability benefits case has a 'continuing burden' to demonstrate that he is disabled, *Mathews v. Eldridge*, 424 U.S. 319, 336, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), and no inference is to be drawn from the fact that the individual has previously been granted benefits. 42 U.S.C. § 423(f). Once the claimant meets this initial responsibility, however, the burden shifts to the Secretary to demonstrate that the claimant is not disabled. *Lewis v. Heckler*, 808 F.2d 1293, 1297 (8th Cir. 1987). If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work. 20 C.F.R. §§ 404.1594(b)(2)-(5).

*Nelson*, 946 F.2d at 1315-16.

The CDR process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f), pursuant to which the Commissioner must determine the following:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to

the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Delph*, 538 F.3d at 945-46.

The regulations define medical improvement as:

[A]ny decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(I).

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's findings are supported by substantial evidence. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Cruse v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record *de novo*. *Id.* at 1328 (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *Id.* at 1320; *Clark v. Chater*, 75 F.3d 414, 416-17 (8th Cir. 1996).

## IV. Discussion

Barber argues that the ALJ failed to properly evaluate severity at Step Two of the

sequential evaluation. Specifically, Barber contends that the ALJ erred in finding Barber's mental impairments were not severe.[1] She argues that this was reversible error because it led to an unsupportable RFC, which changed the outcome of this case.

After the ALJ has determined that a claimant is not engaged in substantial gainful activity, the ALJ then determines whether the claimant has a severe impairment or combination of impairments that has or is expected to last twelve months or will result in death. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(i)-(ii). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms. 20 C.F.R. § 404.1508. To be considered severe, an impairment must *significantly* limit a claimant's ability to do basic work activities. *See* 20 C.F.R § 404.1520(c). "Step two [of the five-step] evaluation states that a claimant is not disabled if his impairments are not severe." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Simmons v. Massanari,* 264 F.3d 751, 754 (8th Cir. 2001)).

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707. "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007)). "It is the claimant's burden to establish that his impairment or combination of impairments are severe." *Kirby*, 500 F.3d at 707 (citing *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000)). "Severity is not an onerous

---

[1] Barber does not challenge the ALJ's findings regarding her physical impairments. Consequently, the Court's discussion herein will focus on Barber's mental impairments.

Page **6** of **17**

requirement for the claimant to meet, ... but it is also not a toothless standard." *Kirby*, 500 F.3d at 708.

In determining the severity of a claimant's mental impairments at Step Two of the sequential evaluation, the ALJ must use the "special technique" described in 20 C.F.R. § 404.1520a.  The ALJ first "evaluate[s] [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)."  20 C.F.R. § 404.1520a(b)(1).  The ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(3).  "If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities[.]"  20 C.F.R. § 404.1520a(d)(1).

The ALJ performed the above analysis in this case.  The ALJ acknowledged in her decision that Barber had the medically determinable impairment of an affective disorder. Regarding the functional area of understanding, remembering, or applying information, the ALJ found Barber had no limitations.  (Tr. 15.)  The ALJ reasoned that mental status examinations performed by treating sources in the post-October 14, 2014 period demonstrated that Barber had intact cognition and memory.

As to the functional area of interacting with others, the ALJ determined that Barber had mild limitations.  *Id.*  The ALJ stated that on "two or three occasions each," mental status examinations showed an abnormal mood (described as depressed, irritable, and/or anxious), an abnormal affect (described as flat, blunt or constricted), and avoidant eye contact; and on one

occasion each, an evasive attitude and pressured speech were noted. *Id.* The ALJ stated that a normal mood and affect were shown at other times, as well as a cooperative attitude, normal eye contact, and normal speech. *Id.*

The ALJ found that Barber had mild limitations in concentrating, persisting, and maintaining pace. *Id.* She explained that mental status examinations indicated that Barber had slow psychomotor activity on two occasions, but normal psychomotor activity on other occasions; and a normal thought process, thought content, and absence of psychosis. *Id.*

Finally, the ALJ found that Barber had mild limitations in the last functional area of adapting and managing herself. *Id.* The ALJ acknowledged that Barber had diminished insight and judgment "on a couple of occasions," but had normal insight and judgment "on other occasions." *Id.* She stated that Barber "seldom visited a mental health provider." *Id.* Specifically, the ALJ stated that the record shows only two visits in early 2016 and "a few" visits from October 2017 to August 2018. *Id.*

The ALJ next rejected the October 2014 findings of a consultative psychologist that Barber exhibited significant psychiatric symptoms on the basis that these were not "typical" symptoms because mental status examinations discussed above were "silent, or largely silent, about them." (Tr. 15-16.) The ALJ found the subsequent opinions of state agency psychologists "unpersuasive" because they were based on the consultative psychologist's report. (Tr. 16.)

After review of the record as a whole, the undersigned finds that the ALJ's Step Two determination is not supported by substantial evidence. The undersigned notes that Barber was initially found disabled solely due to her mental impairments. Specifically, the ALJ that authored the December 5, 2008 favorable decision found that Barber's mood and somatoform

disorders were severe and disabling. (Tr. 187-96.) He found that Barber's mental impairments caused mild to moderate restrictions in activities of daily living, moderate to marked difficulties in maintaining social functioning, and mild to moderate difficulties in maintaining concentration, persistence or pace. (Tr. 193.) The ALJ relied heavily on the March 2008 opinions of a treating psychiatrist that found Barber had moderate to marked limitation of function in multiple areas. (Tr. 194.)

The ALJ in the instant case did not have the benefit of any treating source opinions from the relevant period. The only examining professional to provide an opinion was consultative psychologist Kirmach Natani, Ph.D. Dr. Natani performed a psychological evaluation at the request of the Commissioner on October 9, 2014. (Tr. 729.) Barber complained of variable depression that consists of feeling upset, irritable, sad, lacking energy, and difficulty expressing herself. *Id.* Barber reported that people "with an attitude" make her angry and make her want to hurt them. *Id.* She also complained of difficulty sleeping and decreased appetite. *Id.* Upon mental status examination, Dr. Natani found Barber was alert; adequately groomed; her speech was fast and pushed; her mood was hypomanic with congruent affect; her thoughts were vague, incomplete, and disorganized, with demonstrated difficulty describing her depression; she perceived that people find something wrong with her and talk about it behind her back; her insight was limited; and her judgment was fair. (Tr. 730-31.) Regarding her level of daily functioning, Barber reported that she does chores and shops for groceries with assistance from her home aide worker, never drives, rarely goes out to eat, sometimes rides a bus to engage in fun activities, and attends church. (Tr. 730.) Barber indicated that she has "3 to 5" friends that she calls or visits with on a regular basis. *Id.* Barber's daughters remind her and assist as needed regarding her personal care. *Id.* With respect to concentration, persistence, and pace,

Dr. Natani found Barber's concentration was distracted by intrusive thoughts, her persistence was fair, and her pace was slow for recall and fast for calculations. *Id.* Dr. Natani diagnosed Barber with bipolar I disorder, most recent episode hypomanic, with irritability, mild social paranoia involving people talking about her behind her back, and disorganized thinking, with excessive verbalization. (Tr. 730.) He assessed a GAF score of 60, which he noted reflected moderate symptoms. (Tr. 732.)

The ALJ may decide the extent to which he wishes to rely upon each medical opinion, but he "must give good reasons for the weight apportioned." *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015); 20 C.F.R § 404.1527(d)(2).

The ALJ rejected Dr. Natani's report, finding that it "cannot reasonably be considered indicative of the beneficiary's typical symptoms when mental status evaluations performed by treating sources are silent, or largely silent, about them." (Tr. 15-16.) Although the ALJ indicated that mental status evaluations did not support Dr. Natani's findings, she did not cite to specific medical records. The ALJ did not provide dates of mental status examinations or citations to the record anywhere in her discussion of Barber's mental impairments. Instead, the ALJ merely provided a large string of citations to treatment notes at the conclusion of her discussion, without noting their significance.

The undersigned has reviewed all the treatment notes referenced by the ALJ and agrees with Barber that they reveal significant mental abnormalities. In fact, the ALJ's own statements within her findings support the presence of significant symptoms. For example, the ALJ noted the following findings on mental status examinations during the relevant period: depressed, irritable, or anxious mood (Tr. 1305, 1335); flat, blunt, or constricted affect (Tr. 1305); avoidant eye contact (Tr. 905, 929, 1305); evasive attitude and pressured speech (Tr. 906, 929, 1305);

slow psychomotor activity (Tr. 1305); and diminished insight and judgment (Tr. 906, 929, 1306). (Tr. 15.)

The following summary of the medical evidence provides further support that Barber suffered from a serious mental impairment during the relevant period:

Barber presented to psychiatrist Milapkumar R. Patel, M.D., on January 21, 2015, to establish care. (Tr. 902.) Barber was late for her appointment, was "very vague" during the whole interview, and reported she was not doing well. *Id.* Barber indicated that she was not sure why she came to the clinic and that she forgot to write down her questions and did not remember them. *Id.* Barber was not able to tell Dr. Patel how she spent her day, but stated that it was "boring" and that she does "random things" like watch television. *Id.* Barber complained of concentration issues. *Id.* Dr. Patel stated that Barber was "all over different things" during the interview. (Tr. 903.) When asked about her depression, Barber replied "I don't know." *Id.* She did not look depressed or anxious but reported many somatic complaints. *Id.* Upon mental status examination, Barber was guarded, exhibited poor eye contact, her affect was euthymic and her mood was described as "okay," her thought process was logical but she was vague about all of her answers, she had partial insight, and fair judgment. (Tr. 905-06.) Dr. Patel diagnosed mood disorder NOS; and assessed a GAF sore of 51-60, which is indicative of moderate symptoms. (Tr. 906-07.) Dr. Patel continued Barber's Zoloft and advised her to bring her daughter with her for her next visit so that more history could be obtained. (Tr. 907.)

Barber returned for follow-up on March 12, 2015, at which time she brought her daughter. (Tr. 929.) Barber was again a poor historian and vague in her presentation, and her daughter was not very helpful as she did not know much about her mother. *Id.* Barber

complained of feeling "funny" sometimes but was unable to describe the feeling in more detail. *Id.*  She also reported somatic complaints.  *Id.*  On mental status examination, Barber was guarded, exhibited poor eye contact, was vague about all her answers, had partial insight, and fair judgment.  (Tr. 929.)  Dr. Patel continued Barber's medication, and indicated that Barber may require neuropsychological testing if her symptoms remained vague.  (Tr. 930.)

On October 5, 2017, Barber presented to the Hopewell Center seeking psychiatric services.  (Tr. 1248.)  She reported difficulty remembering things, constant pain, crying spells, irritability, mood swings, decreased appetite, difficulty sleeping, anxiety attacks, and "snapping" at people.  *Id.*  Barber stated that she isolates and gets irritable with people around.  *Id.*  She indicated that these symptoms started "years ago" but could not remember exactly when.  (Tr. 1250.)  Barber's main trigger was her husband, who was incarcerated at that time.  (Tr. 1250.) She lived with her two adult daughters and was having difficulty paying for her utilities.  *Id.* Upon examination, Barber exhibited avoidant eye contact, her motor activity was slowed and agitated, her attitude toward the examiner was evasive and confused, her mood was depressed and irritable, her affect was flat, her speech was pressured, her thought process was logical, she had minimal insight, and an impaired judgment.  (Tr. 1251.)  It was also noted that Barber displayed some difficulty in communicating with and understanding the interviewer.  (Tr. 1254.) The clinician found that Barber required assistance with case management, medication management, utilities, and connection to various other resources.  (Tr. 1256-57.)  She was referred to the Community Psychiatric Rehabilitation Center ("CPRC") at Hopewell Center. (Tr. 1257.)

On February 14, 2018, the CPRC assigned Barber a Community Support Specialist ("CSS")—Stanley Miller.  (Tr. 1313.)  On that date, Barber complained of anxiety, which she

rated as a "level six." *Id.* Barber requested that Mr. Miller assist her with scheduling and attending doctor appoints and completing her application for disability benefits. *Id.* Mr. Miller indicated that he would meet with Barber weekly and provide transportation to doctor visits as needed. *Id.*

Barber argues that the ALJ erred in failing to discuss Barber's need for a CSS. The undersigned agrees. Mr. Miller saw Barber approximately weekly, sometimes more often, from February 2018 through August 2018. (Tr. 1315-1633.) These records reveal Mr. Miller assisted Barber with making doctor appointments, helped her prepare to talk with her doctors, transported Barber to doctor appointments, explained insurance documents to her, helped her obtain a phone, transported her to pharmacies, transported her to businesses to pay utility bills, assisted her with mailing packages, took her to a clothes pantry to obtain shoes, explained to her the procedure of obtaining an ID and then transported her to the Division of Motor Vehicles, transported her to a food pantry to obtain food, helped her prepare for two administrative hearings before the ALJ, transported her to the administrative hearings, and attended the hearings with Barber. *Id.* Mr. Miller indicated on multiple occasions that Barber had difficulty remembering things such as why she was seeing doctors and what the doctor had just told her. (Tr. 1315, 1585, 1610.) On August 8, 2018, he noted that Barber does not "move about the community independently very often." (Tr. 1635.)

The ALJ's determination that Barber's mental limitations were not severe after October 14, 2014 lacks the support of substantial evidence. The ALJ found that Barber had only a mild limitation in her ability to adapt and manage herself. In support of this finding, the ALJ noted that Barber "seldom visited a mental health provider." (Tr. 15.) Although Barber's visits to a

psychiatrist may have been infrequent, the ALJ failed to mention that Barber was seeing Mr. Miller weekly beginning in February 2018.

Barber's receipt of CSS services is relevant in multiple respects. First, it shows that Barber was receiving services related to her mental impairments. Second, Barber required the assistance of a CSS to access medical care, which explains her relative lack of frequent mental health treatment prior to this time. Further, the services Mr. Miller provided to Barber contradict the ALJ's finding that Barber only had mild limitation in her ability to adapt and manage herself. Mr. Miller's records reveal he assisted Barber with essentially every aspect of her life, including obtaining and attending medical appointments, reading paperwork, accessing services, paying utility bills, and obtaining basic needs of food and clothing. Mr. Miller's records are also contrary to the ALJ's finding that Barber had no limitations in her ability to understand, remember, and apply information. As previously discussed, Mr. Miller documented Barber's frequent difficulties with her memory.

Further, state agency psychologists found Barber was more limited than found by the ALJ. Marsha Toll, PsyD., reviewed the record in October 2014 and found that Barber had moderate limitations in her ability to maintain concentration, persistence, or pace; and mild limitations in her activities of daily living and ability to maintain social functioning. (Tr. 762.) As support for her findings, Dr. Toll discussed the consultative examination of Dr. Natani. (Tr. 764.) Dr. Toll also discussed findings from a Cooperative Disability Investigation ("CDI"). *Id.* The CDI revealed that Barber recently posted on social media that she was selling a vitamin product, posted photos of herself with others in a jacuzzi and with her daughter at her graduation, and she occasionally attended a social group for mothers. *Id.* Dr. Toll found that medical improvement had been shown due to Barber's increased social activities; but noted that Barber

was still limited.  *Id.*   Dr. Toll expressed the opinion that Barber was capable of simple, repetitive work.   (Tr. 768.)   Sherri Bassi, Ph.D., reviewed the record on February 25, 2015, and found the same limitations and functional capacity as Dr. Toll.   (Tr. 797-812.)

The ALJ discredited the opinions of the state agency psychologists.   She found the opinions "unpersuasive because they were wholly based on the consultative psychologist's report."   (Tr. 16.)   The ALJ, however, did not provide "good reasons" for rejecting the opinions of the consultative psychologist.   Dr. Natani's findings on examination of fast and pushed speech, vague and disorganized thoughts, difficulty communicating, limited insight, fair judgment, distracted concentration due to intrusive thoughts, fair persistence, and slow recall are consistent with the mental health treatment notes discussed above.   (Tr. 730-31.)   For example, in January 2015, three months after Dr. Natani's evaluation, Dr. Patel found Barber's thought process was "very vague," she could not remember why she was there, was not able to answer questions about how she spent her day, complained of concentration issues, was guarded, exhibited poor eye contact, and she had decreased judgment and insight.   (Tr. 902-07.)   Dr. Patel noted the same findings on examination when Barber returned in March 2015.   (Tr. 929.) Similar findings were noted by the clinician examining Barber at the Hopewell Center in October 2017.   Specifically, Barber exhibited avoidant eye contact, her motor activity was slowed and agitated, her attitude was evasive and confused, her mood was depressed and irritable, her affect was flat, her speech was pressured, and her insight and judgment were decreased.   (Tr. 1251.)

The ALJ appears to have based her Step Two finding almost entirely on some isolated normal mental status examination findings.   Significantly, the majority of normal findings the ALJ referenced were noted by providers treating Barber for unrelated physical issues, such as back pain, a lump in her breast, chest pain, or routine physical check-ups.   (Tr. 848, 851, 1075,

1143, 1147, 1150, 1193, 1200, 1210, 1224, 1361, 1366, 1389, 1393, 1397, 1646, 1659, 1853, 2119, 2123.)   The ALJ offered no rationale for giving more weight to the cursory findings of non-mental health providers rather than the detailed abnormal findings of mental health providers and Barber's CSS.   Although an ALJ is not required to discuss all the evidence submitted, *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000), she nevertheless cannot merely "pick and [choose] only evidence in the record buttressing h[er] conclusion."  *Taylor o/b/o McKinnies v. Barnhart,* 333 F. Supp.2d 846, 856 (E.D. Mo. 2004).

The Court is mindful of its obligation to defer to the ALJ's findings when those findings are supported by substantial evidence and lie within the "available zone of choice."  *See, e.g., Travis v. Astrue,* 477 F.3d 1037, 1042 (8th Cir. 2007); *Partee,* 638 F.3d at 863.   For all of the above reasons, however, the Court does not find substantial evidence to support the ALJ's Step Two finding that Barber had no severe mental impairments during the relevant period.

The Court recognizes that an ALJ's error at Step Two in failing to find a particular impairment severe may not require reversal where the ALJ finds other severe impairments and considers all of a claimant's impairments, severe and non-severe, in assessing the RFC and conducting the rest of the five-step analysis.  *See Spainhour v. Astrue,* No. 11–1056–SSA–CV–W–MJW, 2012 WL 5362232, at *3 (W.D. Mo. Oct. 30, 2012) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and depression to be severe impairments at step 2, such error was harmless because the ALJ clearly considered all of plaintiff's limitations severe and nonsevere in determining plaintiff's RFC.").

Here, however, the ALJ did not consider Barber's mental impairments in making either her RFC finding or her finding at Step Five.   The ALJ found that Barber had the RFC to work at all exertional levels except she could only occasionally kneel, crawl, and climb; and could

frequently stoop and crouch.  (Tr. 16.)  She included no mental restrictions.  Thus, the Step Two error is not harmless, and remand is required.

Accordingly, this matter will be reversed and remanded for an ALJ to further consider Barber's mental impairments.  On remand, the ALJ should consider the treatment notes of record, including the notes of Barber's CSS, accord proper weight to the opinions of Dr. Natani, further develop the medical record if necessary, and determine a proper RFC that considers mental limitations.

/s/ Abbie Crites-Leoni  
ABBIE CRITES-LEONI  
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of March, 2021.